IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
November 1, 2012 Session

**STATE OF TENNESSEE v. DARQUAN SWIFT**

**Appeal from the Criminal Court for Shelby County**
**No. 11-01752      W. Mark Ward, Judge**

**No. W2011-02439-CCA-R3-CD  - Filed June 24, 2013**

A Shelby County grand jury indicted appellant, Darquan Swift, for one count of attempted first degree murder, one count of especially aggravated robbery, one count of attempted especially aggravated robbery, three counts of aggravated robbery, one count of attempted aggravated robbery, and one count of employing a firearm during commission of a dangerous felony in violation of Tennessee Code Annotated section 39-17-1324. Following a trial, a jury found him guilty of the lesser included offense of attempted second degree murder and guilty as charged on all remaining counts. The trial court sentenced appellant to an effective sentence of ninety-seven years in the Tennessee Department of Correction. He now appeals his convictions on the following grounds: (1) whether Tennessee Code Annotated section 39-17-1324 can be applied in a case involving robbery; (2) whether Tennessee Code Annotated section 39-17-1324 can be applied to lesser included offenses of the dangerous felony upon which the State relied; and (3) whether the trial court improperly limited the testimony of appellant's expert witness. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and NORMA MCGEE OGLE, J., joined.

Michael R. Working, Memphis, Tennessee, for the appellant, Darquan Swift.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Amy P. Weirich, District Attorney General; and Paul Hagerman and Neal Oldham, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

## I. Procedural History and Facts

A Shelby County grand jury indicted appellant and co-defendants Danyell Cannady and Ladarrius Carr for the attempted first degree murder of Antonio Burks, the especially aggravated robbery of Vincent Williams, the attempted especially aggravated robbery of Antonio Burks, the aggravated robbery of Daniel Chatman, the aggravated robbery of Kevion Hardaway, the aggravated robbery of Tamingo Williams, the attempted aggravated robbery of Clyde Wade, and unlawfully and knowingly employing a firearm during the commission of a dangerous felony. The crimes occurred when the victims, along with Christopher Burks, were gathered behind a vacant house at 353 LaClede Avenue in Memphis, Tennessee, on July 20, 2009, to "gamble and hang out."

Kevion Hardaway testified that the group was playing dice and talking on the back porch of the house when he heard a noise. When he turned around, someone was pointing a semi-automatic gun at his face. The gunman ordered Mr. Hardaway to the ground and instructed him to take off his pants, in which he had approximately $600, a cellular telephone, and car keys. Police recovered the telephone at a later date. Mr. Hardaway was lying face down on the ground and did not see the perpetrators, but he stated that he heard two people talking and then heard two or three gunshots.

The State's next witness, Daniel Chatman, testified that he was gambling with a group of lifelong friends behind a vacant apartment building. Shortly after Antonio Burks arrived, Mr. Chatman heard someone on the side of the building cock a gun. He then heard a shot and saw Vincent Williams fall. Mr. Chatman tried to run around to the other side of the house, but another person with a gun was standing around the side of the house and told him to get down on the ground. The person pointed a gun toward Mr. Chatman's face.

Mr. Chatman stated that he could only tell that his assailant was a black male of approximately twenty years of age. He was not able to see the person's face because he had lain on the ground as instructed when the person pointed the gun at him. Mr. Chatman testified that the assailant said, "'Give me your money.'" Mr. Chatman acquiesced and removed his wallet from his pants, removed the money from his wallet, and threw the money on the ground. He continued to lie on the ground. Mr. Chatman recalled that the man asked him to remove his pants. Mr. Chatman had just unbuttoned his pants when the assailant fired a shot because he was taking too long. Mr. Chatman then stood up and ran.

Mr. Chatman recalled that there were three people with guns. One man held a gun on him, and the other two people were making everyone else remove their clothes. He observed

Tamingo Williams lying on the porch and Vincent Williams lying on the ground. Mr. Chatman testified that Antonio Burks and his assailant "got to tussling, and shots went off." After Mr. Chatman ran across the street to the back of another house in the alley, he observed three armed men enter a purple four-door truck parked on the street in front of the scene and drive away. On cross-examination, Mr. Chatman confirmed that there were three assailants involved in this incident and that his assailant was possibly in his mid-twenties in age; about five feet, six inches in height; and had a medium skin tone.

The State called Clyde Wade as its next witness. Mr. Wade testified that he was in South Memphis on July 20, 2009, and was traveling to LaClede Avenue with Antonio Burks and Christopher Burks. Mr. Wade testified that he and several friends were about to shoot dice when they heard the sound of guns being cocked followed by a gunshot. Mr. Wade recalled that the assailants said, "You know what it is." Mr. Wade stated that at that point, he and the other victims were told to lie on the ground. He only saw the assailant who held the gun on him. Mr. Wade identified the man from a photograph array and learned that his name was Ladarrius[1] Carr. On cross-examination, Mr. Wade admitted he could not identify appellant.

Christopher Burks,[2] the State's next witness, testified that on July 20, 2009, he and his brother Antonio Burks were at Christopher's barber shop when Clyde Wade arrived and asked them to go to "LaClede" with him. Christopher explained that there was a vacant house on LaClede Avenue, and he and his friends would gather behind the house to gamble. Christopher and Antonio accompanied Mr. Wade to LaClede. Christopher stated that during their time at LaClede, Antonio was not gambling. Christopher recalled hearing guns being cocked on the side of the building and looking around. At that time, two men emerged from the side of the building holding guns. Christopher stated that he heard three or four shots fired and began to run.

Christopher testified that he hid in some tall grass and bushes for one or two minutes. He then emerged from hiding and began asking about Antonio. He found Antonio's hat and assumed that he had gotten away. He called Antonio's cellular telephone, but Antonio did not answer. Antonio returned the call and stated, "Brother, I've been shot." Antonio said that "some dude" was taking him to the hospital, after which Antonio apparently "blacked out." Christopher recalled that Antonio was hospitalized for more than two months and

_____

[1] Mr. Carr's first name is spelled "Ladarrius" in the indictment but as "Ladarius" in the trial transcript. For continuity, we are using the spelling as contained in the indictment.

[2] Several witnesses in this case share the same surname. For clarity, we will refer to them by their first names. By doing so, we intend no disrespect.

endured several surgeries. As a result of the shooting, Antonio walked with a permanent limp and was unable to bend over to tie his shoe. Christopher remembered that Antonio was alert the day the police came to the hospital and stated, "He knew everything." Christopher testified that Antonio told him, "'I just saw the picture, and I pointed him out exactly the one who shot me to the police officer.'"

On cross-examination, Christopher admitted that he viewed possible suspects with the police from a photograph array and could not identify anyone. He recalled that about five or six days after the incident, the police officer showed Antonio the photograph array while Christopher waited outside. When the officer left the room, he entered Antonio's room, and Antonio stated, "'I just identified [appellant] to the police. That's exactly the one who shot me.'" Christopher acknowledged that Antonio was heavily medicated with Morphine at times. When Antonio began hallucinating, Christopher testified that he asked the doctor to stop administering the Morphine, and the doctor complied. He stated he did not recall whether the doctor stopped the Morphine before or after Antonio identified appellant as the perpetrator.

Vincent Williams testified that on July 20, 2009, he was sitting behind a duplex apartment on LaClede. On this particular day, a group gathered behind the duplex talking with Antonio Burks because "Antonio had just got [sic] back in town, and he was getting ready to go back to Spain." The group had been talking for approximately thirty minutes when Tamingo Williams walked up, and they started a dice game. He then observed people approaching from both sides of the building. Vincent, who was wearing a colostomy bag from a previous gunshot wound, described his assault, stating,

> He ran up to me. He told me to get down. I said, "'Man, I'm crippled. I can't get down.'" He punched the gun in my side, and as I kind of moved – tried to move his hand, the gun – he either shot or the gun went off. I don't – you know, but I was shot in the stomach.

Vincent testified that as his assailant was kicking him and taking his pants off, he heard more shots. He stated that $1,320 was taken from him, which he acquired from going to casinos and gambling on the streets. Vincent further testified that he observed three people participating in the robbery and identified appellant as the person who shot him, stating, "I stood there and . . . talked to him before he even shot me. I told him I couldn't get down, so I got a good look at him." He acknowledged that he would have "[a]utomatically" given the assailant his money without being shot.

On cross-examination, Vincent testified that he did not give a statement to the Memphis Police Department and did not recall saying that his assailant had plaits in his hair

held by rubber bands. He further testified that he did not see a police line-up card and stated, "No, I've never seen him in photographs. I've never seen him in television, newspaper[,] or anything."

The State called Tamingo Williams as its next witness. Tamingo testified that on July 20, 2009, he was gambling on the back porch of the LaClede address and had been there for approximately fifteen minutes when he heard a gun cock. He then heard someone say, "Y'all know what this is." When Tamingo heard the gun cock, he lay on the ground. The only thing taken from him was the shorts he was wearing. As he was lying on his side, he saw Antonio Burks run to the side of the house. Tamingo also witnessed an assailant shoot a hole in Mr. Chatman's pants and saw appellant kick Vincent because he was moving too slowly. Tamingo stated that the incident occurred in "broad daylight," and he saw appellant's face when appellant was kicking Vincent. He identified appellant in the courtroom as one of the perpetrators.

On cross-examination, Tamingo testified that his identification of appellant in the courtroom was the first time he had identified anyone from the robbery because he did not want to prosecute. He previously had signed a form refusing to prosecute, stating, "It's just the way we live in the streets, you know. If something happens in the streets, you don't call the police. It's just how we growed [sic] up."

Anthony Jefferson testified that he grew up in South Memphis, Tennessee. At the time of the trial, he lived on LaClede Avenue and was employed as a home health worker. He recalled that on July 20, 2009, he was sitting in his truck outside of his mother's house on LaClede Avenue when he witnessed a few men running down the street in different directions. One man approached his truck and asked if Mr. Jefferson could take him to the hospital because he had been shot.

Mr. Jefferson further testified that the injured man did not identify himself, and he did not recognize him or ask the person's identity. He unlocked the passenger door and told the injured man to get inside. On the way to the hospital, Mr. Jefferson tried to keep the man conscious by talking to him. He called 9-1-1 and alerted the hospital of his pending arrival. Hospital personnel brought out a stretcher to meet them, and the man lay on the stretcher and showed them where he had been shot. Mr. Jefferson did not realize how badly the man had been injured until he noticed a pool of blood in the passenger seat of his truck. Upon returning to LaClede Avenue, Mr. Jefferson learned that his injured passenger was Antonio Burks. He stated that after he heard gunshots, he saw people flee the scene, and Antonio approached his truck a minute or two later. He stated he did not see anyone jump into a getaway vehicle.

Jeffrey Garey, an officer with the Memphis Police Department assigned to the Crime Scene Investigation Unit, testified that he arrived on the scene at 6:04 p.m. on July 20, 2009, collected the physical evidence, sketched the scene, and took the photographs that were identified and entered as exhibits. Investigator Garey explained that due to the overgrown condition of the scene, he had to employ a metal detector in attempting to recover evidence. He only found two spent bullet casings and acknowledged there could have been more.

Antonio Burks testified that he arrived at the scene with his brother Christopher and Clyde Wade. He was not participating in the dice game and had only been there three to five minutes when two men approached from the left side of the building with guns in their hands. The men told everyone to get down and said, "You know what this is." Antonio and some of the other men ran to the right side of the building. He testified, "Once I ran away, I thought I was getting away, but on the right side of the building was a guy waiting there, Darquan, with his gun out." Antonio testified that he was about three to five feet from the gunman when he was shot. He hit the ground immediately and stated, "Once I hit the ground, I ended up rolling over. . . . [H]e was standing over me with the gun still trying to pull the trigger, but the gun was jammed." Antonio further stated, "I was looking at him. I saw [the gun] was jammed, so I got up and hopped down the street." From that point, he did not see the gunman anymore. Antonio identified appellant in the courtroom as the gunman who shot him and stated he was "[p]ositive, 100%."

On cross-examination, Antonio confirmed his initials on the photograph array he viewed in the hospital in which he identified appellant as the gunman who shot him. He admitted that he was on Morphine and Dilaudid while hospitalized and that he suffered from hallucinations in the hospital. Antonio further admitted that while in the hospital, he was medicated and restrained almost to the point of being constantly unconscious but stated, "It still don't [sic] mean I don't remember his face from the day I got shot. I remember his face, won't forget his face, so regardless of the hospital situation, I remember his face."

On redirect examination, Antonio testified that he knew what he was doing when he identified appellant from the photograph array, that he recognized appellant immediately, and that his identification in the courtroom was consistent with his prior identification of appellant.

On recross-examination, Antonio admitted being in the hospital for two months and experiencing hallucinations even after the time he identified appellant. He explained that every time he had surgery, he was placed back on the medicine and went through the same process each time.

Vernon Van Buren, a Memphis Police Department sergeant, testified that he went to the hospital and showed Antonio a photograph array of suspects. Sergeant Van Buren visited Antonio in the hospital on July 25, 2009, at 12:14 p.m. He observed Antonio to be lucid and coherent. Sergeant Van Buren allowed him to view the photographs, and Antonio identified appellant "almost immediately." On cross-examination, Sergeant Van Buren testified that Antonio was "somewhat incapacitated" during his viewing of the photograph display with "a lot of IVs and things in him" and admitted that Antonio was medicated at the time.

Alicia McIntyre testified that she had been living next door to the crime scene since 2005. She had been outside with her children and nephew but had gone inside to complete a telephone call when she heard two gunshots. She ran outside to gather her children and observed three men running toward a turquoise Chevrolet Equinox that appeared purple in the sunlight. Alicia confirmed that the three men were black and in their early twenties. She observed two of the men carrying handguns and one of them also carrying a pair of pants. She stated that she watched the men run to the Equinox that was parked on LaClede Avenue, enter the automobile, and drive away. Alicia testified that her two sisters, Tonishea and Jasmine, were at home with her. Her younger sister, Jasmine, was able to see the license plate on the vehicle and gave the license plate number to the police upon their arrival. On cross-examination, Alicia admitted that she was unable to get a good look at the assailants because she was watching the children. She only saw their backs and could not identify appellant.

The State called Jasmine McIntyre as its next witness. Jasmine testified she was at home on the day of this incident, and she heard Alicia say, "Somebody's shooting." She stated that she ran outside to get her nieces from the front yard and observed some men running from behind the house toward their vehicle. She recalled seeing two black males running to a turquoise sport utility vehicle that, when moved, changed to a purple color. She wrote down the vehicle's license number and gave it to the police. On cross-examination, Jasmine admitted that she saw two people running but could not remember their faces or identify appellant as one of them.

The State's next witness, Tonishea McIntyre, testified that as she was parking in front of her mother's house on LaClede Avenue on the day in question, a bluish-purple Chevrolet Equinox pulled up behind her. She went into the house, and three black males exited the Equinox and proceeded to the back of the house next door. She recalled that Alicia came inside, saying that she heard gunshots. She looked out from the living room and observed three men run back to the Equinox and get in. Tonishea noted that two of the men were carrying handguns, and one man carried a pair of pants.

On cross-examination, Tonishea admitted giving the police a statement within a few hours of the incident in which she described some of the gunmen, but she could not say that appellant was one of the gunmen. On redirect examination, Tonishea agreed with the description of the three perpetrators read from her police statement.

Sergeant Dexter Moses of the Memphis Police Department's robbery squad was the lead investigator on the LaClede Avenue robbery. Sergeant Moses testified that appellant gave a statement of his version of the events. Appellant stated that he traveled to 353 LaClede Avenue with Ladarrius Carr, Danyell Cannady, and a man he knew only as "Cuz," in a purple sport utility vehicle. Appellant advised Sergeant Moses that "they were gambling, and Ladarrius got into an argument with another guy[,] . . . [and] Ladarrius shot him." Appellant stated that after Ladarrius shot the person, "[T]hey ran off." Sergeant Moses confronted appellant with some of the information that the victims had supplied, and appellant became combative and "then shut down." Sergeant Moses stated that the interview was stopped at this point.

On cross-examination, Sergeant Moses acknowledged speaking with Vincent Williams at the hospital the day after the shooting. Mr. Williams described the man who shot him as having a "dark complexion with plaits on his hair with rubber bands on them." He spoke with Antonio Burks at the hospital and stated that Antonio identified appellant before seeing him on a newscast. The State rested its case-in-chief.

Sergeant Michael Rosario was called as a defense witness. He testified that he went to the hospital on the night of the incident around 7:00 p.m. and spoke with Vincent Williams. He told Sergeant Rosario that he was walking "through a cut" on his way to a friend's house when someone approached him. He heard a gun "rack," and someone robbed him of his pants, which contained $1000 and a food stamp card. Sergeant Rosario did not recall Mr. Williams's mentioning being kicked and beaten by his assailant. He testified that Mr. Williams described his assailant as "a dark-skinned male black, twenty-three to twenty-five years old, five-foot-nine, average build."

Dr. James Walker, a board-certified clinical neuropsychologist and a forensic psychologist, testified as an expert witness for the defense. Dr. Walker explained that he was trained in behavior relationships and is one of only five individuals with that training in the United States. He stated that he is often called to testify regarding a person's mental state at the time of an offense, a person's competence to stand trial, and whether a person is faking an injury.

Dr. Walker testified concerning the process of eyewitness identification in criminal cases and outlined the factors that make accurate identifications difficult. He highlighted the

-8-

following factors: the amount of time elapsed between the commission of the crime and the identification process; the feelings people have when they are shown a group of pictures and are asked to pick a person; the amount of time a person has to view a suspect at the moment of a crime; the distance between the witness and the perpetrator, as well as whether the view was clear or obstructed; the stress level at the time of a violent crime – when a gun is pointed, most people look at the gun instead of the face; intervening stress – the person's emotional state when asked to make an identification, whether they are frightened and upset or calm and relaxed; and how the identification material is presented – the medical community's accepted principles say it is best not to show a group of pictures at once because the witness tends to compare among the pictures and tries to pick out the one that looks most like the person they think they remembered. Dr. Walker further testified to factors that would make one person stand out from another, such as height, race, facial hair, clothing, and distinctive features like inmate attire, being in handcuffs, or being escorted by police officers. He stated that the more a person's brain goes over information, the more likely it is to become a permanent memory.

Dr. Walker testified that neuropsychologists tend to work more with physicians as part of a treatment team for patients with a serious brain disorder, disease, or injury by evaluating the patient or leading the treatment team. Dr. Walker said that he was not permitted to prescribe or administer medications, but he conferred with medical doctors about the effects of prescription medications. He also assists in anesthetizing patients before surgery and acknowledged that chemicals present in the body or brain can affect the brain's function. Dr. Walker testified that Morphine and Dilaudid are powerful narcotic analgesics used to control a person's pain, and Versed and Fentanyl are very common drugs used with anesthesia before surgery to control a person's level of consciousness. Further, the common side effects of all four of these medications could make a person very nauseated. "They tend to make a person very sedated or very sleepy. They tend to inhibit the formation of new memories." Dr. Walker stated that hallucinations can occur while a person is taking these medications and could continue after the medication is stopped. He testified that fifty to one hundred micrograms of Fentanyl would be considered a high dose.

Dr. Walker reviewed Antonio Burks's medical records showing that Mr. Burks was intubated during his hospital stay and that the tube was removed at 5:37 p.m. on July 25, 2009. Mr. Burks's medical records indicated that to render the extubation process less painful, he was given two hundred micrograms of Fentanyl per hour beginning on July 23, 2009, with Versed being administered at the rate of two milligrams per hour the day of his arrival, July 20, 2009. Dr. Walker also noted that Mr. Burks was given Dilaudid and Morphine for discomfort at an unspecified dose, as well as two milligrams of Versed per hour and two hundred micrograms of Fentanyl per hour, which he stated were "large enough doses to keep the average person quite unconscious." He added that being given that much

medication would make a person's memory recall "less reliable." Dr. Walker testified that Antonio Burks "continued to receive large doses of Fentanyl, Morphine[,] and Versed in the days following, up until August the 22nd of 2009."

On cross-examination, Dr. Walker admitted he had never been to "The Med" hospital, had not met or spoken with any witnesses in this case, and had not talked with doctors or nurses who made entries in the medical records. He agreed that "[a]n identification can be accurate." On redirect examination, Dr. Walker acknowledged that identifications are less reliable when there is a span of two years between incident and identification and also less reliable when a person is intubated and brain- and memory-altering chemicals are present in the body.

After deliberating, the jury found appellant guilty of the lesser included offense of attempted second degree murder and guilty of all remaining counts as charged. After a sentencing hearing,[3] the trial court sentenced appellant to twenty-five years for especially aggravated robbery, twelve years for attempted second degree murder, twelve years for attempted especially aggravated robbery, twelve years for each of the three counts of aggravated robbery, six years for attempted aggravated robbery, and six years for employing a firearm during commission of a dangerous felony. The court further ordered all sentences to be served consecutively to each other, resulting in an effective sentence of ninety-seven years in the Tennessee Department of Correction.

## II. Analysis

Appellant does not argue an abuse of discretion with regard to the trial court's sentencing decision concerning length or manner of service of his sentences. His only argument is that the trial court erred in ordering consecutive service of the sentences for his various robbery convictions and his conviction for employing a firearm during the commission of a dangerous felony.

### A. Application of Tennessee Code Annotated Section 39-17-1324

Appellant raises several issues with regard to his conviction of employing a firearm during the commission of a dangerous felony. *See* Tenn. Code Ann. § 39-17-1324(b)(1) (2010). His first argument is that the consecutive sentence mandated by section 39-17-1324(e)(1) cannot be applied to his conviction under the statute and to his various robbery

---

[3] Because the only issue appellant raised with regard to his sentences is the application of Tennessee Code Annotated Section 39-17-1324 to sentence alignment, we have not summarized the record of the sentencing hearing or the findings of the trial court in support of the sentences.

convictions because employing a firearm is an element of all of his various robbery convictions.

In this case, the indictment did not specify which dangerous felony gave rise to this offense. Tennessee Code Annotated enumerates certain felonies that are considered dangerous felonies. *See id*. § 39-17-1324(i)(1). However, prior to instructing the jury, the trial court held a jury-out hearing to discuss which dangerous felony should be designated. The State elected to designate attempted second degree murder and attempted voluntary manslaughter, which are both lesser included offenses of attempted first degree murder, as the dangerous felonies upon which it would proceed.[4] The statute in effect at the time of these offenses listed attempted second degree murder and attempted voluntary manslaughter as dangerous felonies but did not include especially aggravated robbery and aggravated robbery.[5] *Id.*

To be clear, employing a firearm is not a required element of any form of robbery. *See* Tenn. Code Ann. §§ 39-13-401, -02, -03 (2010). Rather, it is the use of "a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon" that "aggravates" an offense from robbery to a higher degree of robbery. *Id.* § 39-13-402, -03. Even though the offenses of aggravated robbery and especially aggravated robbery can be completed without the use of a firearm, for whatever reason, our legislature chose to omit robbery in all of its forms from the purview of Tennessee Code Annotated section 39-17-1324. In construing the statute's application to the instant case, we must

> give effect to legislative intent without unduly restricting or expanding the intended scope of a statute. However, if the statutory language is ambiguous[,] courts must look to the statutory scheme as a whole, as well as legislative history, to discern its meaning. If the plain meaning of a statute is applied in specific situations so as to produce an absurd or incongruous result, the intent of the General Assembly will prevail over the statutory language.

---

[4] The State's election of two lesser-included offenses of the indicted offense did not create the possibility of a non-unanimous jury verdict because the trial court instructed the jury, in accordance with the pattern jury instructions, that it "shall not proceed to consider any lesser-included offense until [it has] first made a unanimous determination that the defendant is not guilty of the immediately-preceding greater offense . . . ." T.P.I. Crim. 41.01, (15th ed. 2011). A jury is presumed to follow instructions from the trial court. *State v. Austin*, 87 S.W.3d 447, 472 (Tenn. 2002).

[5] We note that effective August 15, 2009, the General Assembly added attempted first degree murder to the list of dangerous felonies. However, the offenses made the basis of this appeal pre-dated this legislative amendment.

*State v. Magness*, 163 S.W.3d 300, 304 (Tenn. 2004) (internal citations and quotations omitted). "A fundamental rule of statutory construction is that 'the mention of one subject in a statute means the exclusion of other subjects that are not mentioned.'" *State v. Blanchard*, 100 S.W.3d 226, 229 (Tenn. 2002) (quoting *State v. Harkins*, 811 S.W.2d 79, 82 (Tenn. 1991)).

In passing this law, the General Assembly considered the ramifications of convictions under the statute and specifically required consecutive service of convictions for violation of it and for the underlying felony. Tenn. Code Ann. § 39-17-1324(e)(1) (2010). The statute is silent with regard to all other sentencing alignment considerations and does not place any other requirements or limitations in this regard. Because the legislature "mentioned" one aspect of sentencing alignment in isolation, the tenets of statutory construction require that we exclude other sentencing alignment issues from the penumbra of section 39-17-1324. Appellant's argument is without merit.

Furthermore, appellant utilized a deadly weapon, a firearm, in the commission of the various robbery offenses. In his argument, appellant asks this court to determine that because he utilized a firearm in the commission of the various robberies in this case, the trial court was precluded from ordering consecutive service of his conviction pursuant to section 39-17-1324 and the robbery convictions. This position would require this court to recognize a dichotomous application of section 39-17-1324 in cases involving an accompanying robbery conviction, allowing a trial court to order consecutive sentences if the perpetrator utilized a knife or other deadly weapon but prohibiting the same if he instead employed a firearm. This would produce an incongruous result based on the choice of deadly weapon employed by the perpetrator. Had appellant utilized a knife in committing these offenses instead of a firearm, his argument would be rendered moot. We cannot conclude that the legislature intended such an absurd result for cases that result in the same convictions and carry the same sentence exposure but that differ with regard to the weapon employed.

Moreover, appellant's argument that a conviction pursuant to Tennessee Code Annotated section 39-17-1324 cannot be sustained in cases involving a robbery of any degree regardless of whether the firearms conviction is based upon the robbery or another dangerous felony is unpersuasive. This court has affirmed a case involving convictions for especially aggravated kidnapping, attempted second degree murder, aggravated robbery, and employing a firearm during the commission of a felony in which, as in this case, the State elected attempted second degree murder as the underlying felony. *See State v. Bennie Osby*, No. W2012-00408-CCA-R3-CD, 2012 WL 5381371, at *10 (Tenn. Crim. App. Nov. 2, 2012). Were we to accept appellant's premise, it would logically extend to the application of section 39-17-1324 to other situations that involve a conviction of and consecutive sentencing for an offense that is not an enumerated dangerous felony and a violation of

section 39-17-1324, such as aggravated rape. This court has previously upheld a trial court's sentencing decision ordering partial consecutive service of sentences imposed for, among other offenses, aggravated rape, violation of section 39-17-1324, and aggravated burglary (the underlying dangerous felony). *See State v. Michael Antonio Dodson*, No. M2010-01047-CCA-R3-CD, 2011 WL 5831759, at *1 (Tenn. Crim. App. Nov. 21, 2011), *perm. app. denied* (Tenn. Apr. 20, 2012). Again, appellant's argument is meritless.

The fact that section 39-17-1324 cannot be utilized with a form of robbery as the underlying dangerous felony does not preclude its application in a case where robbery is one of many indicted criminal offenses but is not relied upon as the underlying dangerous felony for purposes of the firearms statute. We deny relief on this claim of error.

Appellant also asserts that Tennessee Code Annotated section 39-17-1324 cannot be applied to lesser included offenses. There is support in our case law for the proposition that Tennessee Code Annotated section 39-17-1324 can be applied to lesser included offenses. *See State v. Lorenzo McLemore, III, and Melissa Denise Gaines*, No. M2010-01189-CCA-R3-CD, 2012 WL 695325, at *10 (Tenn. Crim. App. Feb. 6, 2012), *perm. app. denied* (Tenn. May 16, 2012). In that case, appellant McLemore was convicted of a violation pursuant to section 39-17-1324 with attempted voluntary manslaughter, a lesser included offense of the indicted charge of attempted first degree murder, as the underlying dangerous felony. *Id.*

Moreover, we determine from our reading of the statute in question that a conviction based on a lesser included dangerous felony is not precluded. Tennessee Code section 39-17-1324(c) permits the State to elect to indict a defendant for a lesser included offense of a criminal offense that would otherwise be ineligible as a dangerous felony under section 39-17-1324 so that the State can also charge a violation of this statute. By allowing such a procedure, the legislature clearly anticipated that the statute would be applied to lesser included offenses. Appellant is not entitled to relief on this claim.

Finally, appellant contends that his conviction pursuant to Tennessee Code section 39-17-1324 violates the prohibition against *ex post facto* application of laws. Specifically, he argues that because attempted first degree murder was not an enumerated dangerous felony under the statute at the time of the criminal offenses, the State cannot rely upon lesser-included offenses of the indicted offense to satisfy the statutory requirement. Appellant's argument rests upon the theory that section 39-17-1324 is an "enhancement" statute that "change[s] punishment or inflict[s] greater punishment than the law annexed to the crime when committed." This argument is incongruent with the plain language of the statute, which states that a violation of the statute "is a specific and separate offense, which shall be pled in a separate count of the indictment or presentment . . . ." Tenn. Code Ann. § 39-17-1324(d) (Supp. 2012). Appellant's claim is without merit.

## B. Dr. Walker's Testimony

Prior to Dr. Walker being called as a witness, the trial court held a hearing outside of the presence of the jury. The trial court asked about the matters to which the defense expected Dr. Walker to testify. Defense counsel stated Dr. Walker would testify as to whether the eyewitness identification process was reliable and whether the victim's identification of appellant was reliable.

During the jury-out hearing, Dr. Walker explained his education and professional background and described the scope of his expertise as both a neuropsychologist and a forensic psychologist. He testified that he possessed specialized knowledge of the effect that chemicals cause when introduced into the body and specifically into the brain. He also noted that when he testified in the past in other cases, he never testified as to the validity of the identification of a specific individual, only the process utilized in securing the identification and other determining factors.

After the jury-out hearing, the trial court stated that it would allow Dr. Walker to testify about the general principles affecting the accuracy of eyewitness identification but limited the scope of the testimony by prohibiting him from discussing conclusions contained in his report, such as, "There are notable inconsistencies between the police records and the medical records of Mr. Burks." The trial court noted that Dr. Walker's conclusion did not require an expert witness's testimony. The trial court also permitted Dr. Walker to testify in response to a hypothetical question that if Mr. Burks had been receiving certain drugs, the medication could affect him in some way. Dr. Walker also could testify that the medical records indicated that Mr. Burks was intubated at the time the officer stated that Mr. Burks identified a photograph of appellant.

The trial court specifically instructed defense counsel and Dr. Walker concerning the areas about which the doctor could testify. At the conclusion of the trial court's ruling, the trial court asked, "Is there anything else you want him to testify to?" Defense counsel answered, "Not that I can think of at the moment."

We begin our analysis of appellant's claim concerning Dr. Walker's testimony with the proposition that admissibility of expert testimony is governed by the Tennessee Rules of Evidence:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Tenn. R. Evid. 702. Our supreme court has further defined the role of the trial court in assessing the propriety of expert testimony:

> Trial courts act as gatekeepers when it comes to the admissibility of expert testimony. Their role is to ensure that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. A court must assure itself that the expert's opinions are based on relevant scientific methods, processes, and data, and not upon an expert's mere speculation. The court's reliability analysis has four general inter-related components: (1) qualifications assessment, (2) analytical cohesion, (3) methodological reliability, and (4) foundational reliability.

*State v. Scott,* 275 S.W.3d 395, 401-02 (Tenn. 2009) (internal citations and quotations omitted).

The trial court is vested with broad discretion in resolving questions regarding the admissibility of expert testimony. *State v. Copeland*, 226 S.W.3d 287, 301 (Tenn. 2007). On appellate review, we will not disturb a trial court's decision regarding the admission or exclusion of expert testimony absent an abuse of discretion. *Scott,* 275 S.W.3d at 404. A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party. *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)).

In this case, the trial court allowed Dr. Walker to testify to the situational and psychological factors affecting the reliability of identifications in general. Dr. Walker also offered testimony about the effect of mind-altering drugs such as Fentanyl and Versad, the average dosage of those drugs, the fact that the victim was intubated at the time he identified appellant, and the amount of those drugs being administered to the victim during his hospitalization. The only prohibition was that Dr. Walker could not testify that the victim was in a medically-induced coma or was otherwise unconscious at the time he made the positive identification of appellant. The trial court did not abuse its discretion in so ruling.

Dr. Walker testified that he had never been to "The Med," had not interviewed the doctors or nurses who attended the victim, and had not met with any of the witnesses in this case. Based on the medical records alone, Dr. Walker could not testify to the level of the victim's consciousness. He did not have personal knowledge of whether the victim was in a medically-induced coma or whether he was unconscious at the time he identified appellant. He could only opine, based on his education and experience, that the amount and type of

medications the victim was receiving at the time were considered high dosages and would have been great enough to cause an average person to become "quite unconscious." He further testified that the drugs could cause hallucinations and could impair one's ability to form memories.

The trial court properly excluded Dr. Walker's proffered opinion about matters of which he had no personal knowledge. In so ruling, the trial court did not abuse its discretion, and appellant is not entitled to relief on this issue.

## CONCLUSION

Based on our review of the record, the parties' briefs, the arguments of counsel, and the applicable law, we discern no error and affirm the judgments of the trial court.

_____
ROGER A. PAGE, JUDGE