IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 25, 2016 at Knoxville

## STATE OF TENNESSEE v. WILLIAM ROLANDUS KEEL

**Appeal from the Criminal Court for Davidson County**
**No. 2013-A-673    J. Randall Wyatt, Jr., Judge**

---

**No. M2016-00354-CCA-R3-CD – Filed January 11, 2017**

---

The defendant, Williams Rolandus Keel, appeals his Davidson County Criminal Court jury convictions of rape of a child, claiming that the trial court erred by denying his motion to compel production of certain documents, that the trial court erred by excluding the testimony of his expert witness, and that the sentence imposed was excessive. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which J. ROSS DYER, J., joined. ROBERT L. HOLLOWAY, JR., J., filed a separate concurring opinion.

Chad Davidson, Nashville, Tennessee, for the appellant, William Rolandus Keel.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Chad Butler and Brian Ewald, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The Davidson County Grand Jury charged the defendant with two counts of rape of a child. The trial court conducted an initial jury trial in March 2015, which resulted in a hung jury and a mistrial. In the second trial in December 2015, the defendant elected to proceed pro se with the assistance of elbow counsel.

The State's proof at trial showed that the victim, V.S.,[1] was born in June 2000 and lived with her grandparents and her younger siblings in Nashville. At some point in 2011 or early 2012 when the victim was either 10 or 11 years old, the victim and

---

[1]    It is the policy of this court to refer to the minor victim by initials.

the defendant, who was her then-stepfather, were playing the board game Monopoly in the defendant's bedroom; the bedroom was located on one side of the duplex owned by the victim's grandmother. During the course of the game, the defendant and the victim "came up with a bet" that if the victim won, she would "get ungrounded," and if the defendant won, he could "do whatever." After the defendant won the game, he instructed the victim to turn around. When he told her to turn back toward him, his genitals were exposed. The defendant forced the victim to sit on the ground, used his hands to forcibly open her mouth, and he placed his penis inside her mouth. The victim could not recall the length of time of the assault, and she did not see the defendant ejaculate. The defendant told the victim "not to tell anybody or it would happen again." Following the assault, the victim returned to her grandmother's side of the duplex. She testified that she told no one because she "was too scared . . . of what he said."

The victim testified that the second incident occurred at the residence of the defendant and the victim's mother when the victim was "[a]round 11" years of age. The defendant came to the victim's grandmother's house one morning to drive the victim to school, and while en route to school, the victim told the defendant that she needed to use the restroom. The defendant stopped at the house in Donelson. When the victim came out of the bathroom, the defendant was "standing right there." She attempted to shut the bathroom door, but the defendant pushed it open, causing the victim to fall to the floor. The defendant had again exposed his genitals and forced his penis into the victim's mouth. The victim denied that she saw the defendant ejaculate, and she testified that this assault did not last "too long" because she "had to get to school." The defendant then drove the victim to school, and the victim did not immediately tell anyone about the assault because she "was scared that he would do it again."

The victim eventually informed her grandmother, C.F.,[2] that the defendant had "made [her] put his private part in [her] mouth." C.F. then contacted law enforcement officers.

Denise Alexander, a forensic social worker with Our Kids Clinic, conducted a pediatric forensic medical examination of the victim on March 22, 2012. Ms. Alexander found the victim to be "outgoing and friendly" until Ms. Alexander mentioned the defendant's name, at which time the victim "became very quiet and stated [that] she didn't like him very much." At that point, the victim "refused to speak about [the defendant] any further." The victim denied that anyone had ever touched her inappropriately. Ms. Alexander explained that such denials are "not uncommon" during interviews with suspected child sexual abuse victims.

---

[2] To protect the anonymity of the minor victim, we will refer to her grandmother by her initials as well.

Lori Littrell, a physician assistant at Our Kids Clinic, performed the physical portion of the victim's forensic medical examination. Ms. Littrell found no "trauma or visible injury" to the victim, which she testified was not uncommon. Ms. Littrell testified that, because the time period from the victim's initial disclosure to C.F. until the victim's examination was greater than 72 hours, she knew "the likelihood of recovering any type of DNA" would be "pretty much non-existent."

Charlsi Legendre, senior forensic interviewer with the Nashville Children's Alliance, testified that her organization provides forensic interviews and counseling services for minor victims of sexual abuse and other victims of severe physical abuse and neglect. Ms. Legendre explained that one of her former employees had conducted a forensic interview of the victim in May 2012. Through Ms. Legendre's testimony, the State introduced into evidence and played for the jury a video recording of the victim's forensic interview, during which the victim described the incidents of sexual abuse perpetrated by the defendant following the game of Monopoly and inside the bathroom at the defendant's house.

With this evidence, the State rested. Following the trial court's denial of the defendant's motion for judgments of acquittal and a *Momon* colloquy, the defendant elected not to testify but did choose to present other proof.

Kenneth Hardy testified that he had been previously employed as a case manager with the Department of Children's Services ("DCS"). Mr. Hardy stated that, on June 29, 2011, he conducted a home visit at the residence of C.F. and spoke with the victim. Mr. Hardy explained that "[s]omeone reported to [DCS] something concerning these children" and that he was the case manager assigned to conduct "a physical view of the children in their home." When Mr. Hardy interviewed the victim, she told him that she was not afraid of the defendant; that she had received "a whooping with a paddle" approximately two years prior but that she had never been injured; and that her mother was currently incarcerated. Mr. Hardy testified that the victim did not mention anything about sexual abuse during the interview.

Rashondalyn Nixon testified that she had been a case manager with DCS in 2012 and that she had been present on the night that the victim accused the defendant of sexual abuse. Ms. Nixon reviewed her notes from her interview with the victim and testified that, with respect to the Monopoly incident, the victim stated that she had lost the game and the defendant "made her look at his body part."

Based on this evidence, the jury convicted the defendant as charged of both counts of rape of a child. Following a sentencing hearing, the trial court sentenced the defendant as a standard offender to a term of 30 years' incarceration for each conviction,

to be served at 100 percent by operation of law. The court ordered the sentences to be served consecutively for a total effective sentence of 60 years. Following the denial of his timely motion for new trial, the defendant filed a timely notice of appeal.

In this appeal, the defendant contends that the trial court erred by denying his motion to compel production of DCS records, that the trial court erred by excluding the testimony of his expert witness, and that the sentence imposed was excessive. We will address each issue in turn.

## I. Failure to Disclose

The defendant first contends that the trial court erred by denying his request to review the victim's DCS records following the trial court's in camera review of such records. We disagree.

"It is well settled that the government has the obligation to turn over evidence in its possession that is both favourable to the accused and material to guilt or punishment." *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987) (citing *United States v. Agurs*, 427 U.S. 97 (1976); *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). Indeed, the "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. To establish a due process violation via the suppression of evidence, the defendant must establish that (1) he "requested the information (unless the evidence is obviously exculpatory, in which case the [S]tate is bound to release the information whether requested or not)," (2) "the State suppressed the information," (3) "the information was favorable to" his case, and (4) "the information was material." *Johnson v. State*, 38 S.W.3d 52, 56 (Tenn. 2001). "Evidence 'favorable to an accused' includes evidence deemed to be exculpatory in nature and evidence that could be used to impeach the [S]tate's witnesses." *Johnson*, 38 S.W.3d at 55-56 (citing *State v. Walker*, 910 S.W.2d 381, 389 (Tenn. 1995); *State v. Copeland*, 983 S.W.2d 703, 706 (Tenn. Crim. App. 1998); *United States v. Bagley*, 473 U.S. 667, 676 (1985)).

> Although courts have used different terminologies to define "materiality," a majority of this Court has agreed, "[e]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."

*Ritchie*, 480 U.S. at 57 (citations omitted); *see also Bagley*, 473 U.S. at 682.

In the instant case, the defendant moved the trial court to order production of the victim's DCS records "from March 2012 to current." In the motion, the defendant averred that, because he already had possession of the victim's DCS records from 2008 until early 2012, he had "a good faith basis to believe that there would be additional statements in the records from March 2012 to current that would be material to [his] defense." The trial court then conducted an in camera review of the requested records and denied the defendant's request, finding "[a]fter a careful and thorough review" that "the records contain no exculpatory or material information that the [d]efendant is entitled to have."

The defendant relies on this court's opinion in *State v. Doyle Winslow Smith*, No. E2006-02642-CCA-R3-CD (Tenn. Crim. App., Knoxville, Dec. 19, 2008), to support his position that the trial court erred by denying his request to review the DCS records. The defendant's reliance on this case, however, is misplaced. In *Doyle Winslow Smith*, the defendant requested the child rape victim's DCS records that pertained to her juvenile criminal record. *Id.*, slip op. at 9. The trial court denied the request, determining "that the defendant's pleadings did not sufficiently allege a basis for an in[]camera review of the records under *Ritchie*." *Id.* This court reversed the judgment of the trial court and remanded for a new trial because, in part, the trial court "abused its discretion in declining to review the records following the defendant's request." *Id.* Here, however, the trial court conducted an in camera review of the records and determined that they contained "no exculpatory or material information." Our review of those same records persuades us that the trial court reached the correct conclusion. Because the records contained no information that would likely have changed the outcome of the defendant's trial, no *Brady* violation occurred, and the trial court did not err in denying the defendant's request to review the records.

## II. Expert Testimony

The defendant next contends that the trial court erred by denying his request to offer the expert testimony of Doctor William Bernet, who was prepared to testify about the impropriety of the interview techniques utilized by the Nashville Children's Alliance in its interview of the victim. The State argues that the court did not err by excluding the testimony.

Prior to trial, the State sought to exclude the testimony of the defendant's proffered expert, Doctor Bernet. At the hearing on the admissibility of his testimony, Doctor Bernet, a semi-retired forensic and child psychiatrist from Vanderbilt University with a degree from Harvard Medical School, testified that he had spent 25 years

conducting research on the reasons "why children sometimes make false statements regarding various types of abuse." Doctor Bernet stated that he had testified approximately 300 times and that he had been qualified as an expert in child psychiatry "[m]any, many times" in "16 or 17 states" including Tennessee.

In preparation for his testimony at the hearing, Doctor Bernet reviewed the victim's DCS case files, her forensic examination from Our Kids Clinic, her May 2012 forensic interview, her medical records, and her counseling records. Doctor Bernet confirmed that he had not spoken with or interviewed the victim, the defendant, or any other family members.

Doctor Bernet discussed an article he wrote entitled "False Statements and the Differential Diagnosis of Abuse Allegations" which was published in the *Journal of the American Academy of Child and Adolescent Psychiatry* in 1993. In that article, Doctor Bernet concluded that "when children make statements about being abused they are not always telling something that is factually correct," and he identified "15 or 16 . . . different mental mechanisms by which children sometimes make false statements regarding abuse." With respect to the victim's case, Doctor Bernet opined that "caregiver suggestion," "caregiver indoctrination," "innocent lying," "interviewer suggestion," and "over-stimulation" all potentially influenced the victim to falsely accuse the defendant.

Doctor Bernet also discussed an article he authored called "Practice Parameters," which was written "to help guide child psychiatrists and other people who conduct evaluations in how to evaluate children who may have been abused." In reviewing the victim's case against the directives in his article, Doctor Bernet criticized the investigation team for failing to investigate thoroughly the victim's differing accounts of the abuse, the conflicts between the defendant and other family members, and perceived sexual behaviors "among the children in the family." Doctor Bernet believed that the Nashville Children's Alliance interviewer failed to engage in a "free narrative" with the victim, which he opined would have produced more reliable responses.

On cross-examination, Doctor Bernet denied that he believed the victim had been brainwashed but stated that "it is something that should be considered as whether . . . a parent or grandparent suggested information to her." In response to the query of whether he had ever conducted a forensic interview as part of a DCS investigation, Doctor Bernet stated that he had done two such interviews more than 10 years ago. He acknowledged that he had never completed a formal week-long forensic interview training course and that he had never been involved with formal peer-critiquing. Doctor Bernet also conceded that he had not conducted any independent research on any of the nationally-utilized forensic interview protocols.

With respect to Doctor Bernet's 1993 article on false statements, he testified that the article included 13 "short case vignettes" but that there were no comparison or control groups. Doctor Bernet explained that such groups would not have been relevant to his study because it was one of "qualitative research" rather than "quantitative research." Doctor Bernet estimated that he had been permitted to testify as an expert "about 20 times" in criminal cases, though he conceded that his testimony did not address "the ultimate issue of the child's truthfulness" but rather "in a general way the different mechanisms by which children sometimes are not truthful."

Doctor Bernet acknowledged that research regarding children's suggestibility showed that "by the age of 10, 11, 12 years of age, children are no more suggestible than adults."

At the conclusion of the hearing, the trial court took the motion under advisement and, in a comprehensive, later-filed written order, ruled that Doctor Bernet would not be permitted to testify because his "proposed testimony is irrelevant in this particular case; that even if it is relevant, its minimal probative value is substantially outweighed by the danger of unfair prejudice to the State and the risk of confusing or misleading the jury," and that, in any event, "the proposed testimony does not meet the requirements of Rules 702 and 703." Specifically, the trial court noted that the victim was "nearly 12 years old at the time of the disclosure and forensic interview" and that, because Doctor Bernet had agreed that research indicated a child of that age was "no more suggestible than an adult," the inapplicability of the doctor's "mental mechanisms" to the victim would render his testimony irrelevant. With respect to possible juror confusion, the court stated as follows:

> [Doctor] Bernet testified that he had no opinion as to whether the alleged victim's allegations are true or not; he only purports to give the jury factors to consider. However, implicit in his testimony is the suggestion that there are several reasons why the alleged victim might not be telling the truth or might be inaccurate in her recollection. Thus, the jury could easily be confused as to how to consider the evidence.

The trial court also found the doctor's testimony to be inadmissible under Tennessee Rules of Evidence 702 and 703:

> The [c]ourt acknowledges that [Doctor] Bernet has an outstanding educational pedigree and has had a long and distinguished career as a psychiatrist. However, the [c]ourt

finds that [Doctor] Bernet has authored one article on the topic of why children sometimes make false statements regarding abuse, and it was published in 1993 – 22 years ago. Moreover, the [c]ourt finds that the science and methodology behind the conclusions in [Doctor] Bernet's article, which form the substance of his proposed testimony, is not reliable. [Doctor] Bernet selected 13 cases, some from his own practice and some from a literature review of other researchers. There was no sound methodology presented to the [c]ourt as to how these cases were selected. In fact, [Doctor] Bernet acknowledged that the determination that the children in the cases he reviewed made false allegations was almost entirely subjective. Additionally, [Doctor] Bernet failed to consider cases where children were deemed to have made accurate or truthful allegations to test the application of his theory in that context. As a result, the [c]ourt has no way of knowing an error rate of whether [Doctor] Bernet's opinions are scientifically sound. The [c]ourt acknowledges that the article was peer-reviewed, as was his "Practice Parameters" article. However, there was minimal evidence that his opinions and conclusions are widely accepted in the scientific community, and peer-review alone do[es] not necessarily make the evidence admissible. The [c]ourt simply does not find the science behind [Doctor] Bernet's testimony to be reliable enough to permit him to offer the proposed testimony.

Finally, the trial court found that the doctor's testimony "would not *substantially* assist the jury," noting that the probative value of the proposed testimony was "very low"; that he could not give an opinion on whether the victim was telling the truth or whether the defendant was guilty; and that "most of the points [Doctor] Bernet made in his proffer could be made by the [d]efendant's attorneys at trial through cross-examination of the State's witnesses."

The admissibility of expert testimony is governed by Rules 702 and 703 of the Tennessee Rules of Evidence. *See generally McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257 (Tenn. 1997). Rule 702 addresses the need for expert testimony and the qualifications of the expert: "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. Rule

703 focuses on the reliability of expert opinion testimony. Generally, the admissibility of expert testimony is a matter entrusted to the sound discretion of the trial court, and there can be no reversal on appeal absent clear abuse of that discretion. *See State v. Scott*, 275 S.W.3d 395, 404 (Tenn. 2010); *State v. Copeland*, 226 S.W.3d 287, 301 (Tenn. 2007). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *Scott*, 275 S.W.3d at 404 (citing *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008)).

We find no abuse of discretion in the trial court's decision to exclude the proffered expert testimony of Doctor Bernet. Given the victim's age at the time she revealed the abuse, the trial court's conclusion that Doctor Bernet's testimony regarding the suggestibility of children would have been irrelevant was not illogical. *See* Tenn. R. Evid. 401, 402. The doctor's inability to give an opinion as to the veracity of the victim while giving the jury "facts to consider" about her potential untruthfulness could certainly have led to juror confusion. *See* Tenn. R. Evid. 403. Finally, the lack of reliable scientific evidence and methodology behind Doctor Bernet's conclusions justified the trial court's determination that the expert opinion would not "substantially assist" the trier of fact. *See* Tenn. R. Evid. 702, 703. Accordingly, the defendant is not entitled to relief on this issue because no abuse of discretion was shown.

### III.  Sentencing

Finally, the defendant claims that the trial court erred in its application of one enhancement factor and by failing to apply one mitigating factor. Specifically, the defendant contends that the trial court erred in its application of enhancement factor seven, that the offense was committed to gratify the defendant's desire for pleasure or excitement, s*ee* T.C.A. § 40-35-114(7); the defendant does not take issue with the trial court's application of the defendant's prior criminal history, the defendant's failure to comply with past conditions of release, and that the defendant abused a position of trust, *see id.*, § 40-35-114(1), (8), (14). With respect to mitigating factors, the defendant argues that the trial court should have applied factor one, that the defendant's conduct neither caused nor threatened serious bodily injury. *See* T.C.A. § 40-35-113(1). The State responds that the 60-year sentence imposed by the trial court was appropriate.

Our standard of review of the trial court's sentencing determinations in this case is whether the trial court abused its discretion, but we apply a "presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a

consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed."  T.C.A. § 40-35-103(5).  Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'"  *Bise*, 380 S.W.3d at 706 n.41 (citing T.C.A. § 40-35-210(e)).  Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute."  *Id.* at 709.

We need not tarry long over the defendant's claim because, even assuming that the trial court misapplied or failed to apply certain enhancement factors or mitigating factors, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005."  *Bise*, 380 S.W.3d at 706.  Nothing in the record suggests that the trial court in this case "wholly departed from" the Sentencing Act.  To the contrary, the record reflects that the trial court considered all the relevant principles associated with sentencing, including the enhancement and mitigating factors, when imposing the sentence in this case.  Accordingly, we conclude that the record fully supports the length of sentence imposed in this case.

To the extent the defendant attempts to argue that the trial court erred in its application of consecutive sentencing, his failure to support this assertion with any argument renders it waived.  *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").  Indeed, the defendant's references on appeal to consecutive sentencing are limited to the mere statement that the trial court "incorrectly applied consecutive sentencing" and a reference to Code section 40-35-115 which "discusses multiple convictions and states, in pertinent part, '(a) If a defendant is convicted of more than one (1) criminal offense, the court shall order sentences to run consecutively or concurrently as provided by the criteria in this section.'"  This, quite simply, does not equate to the mandate of Rule 10, and, accordingly, review of consecutive sentencing is waived.

*IV.  Conclusion*

Based upon the foregoing analysis, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE

- 10 -