IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs at Knoxville September 26, 2018

**STATE OF TENNESSEE v. JARVIS GRAY A/K/A PROPHET GRAY**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 15-05893        Lee V. Coffee, Judge**

_____

**No. W2017-01731-CCA-R3-CD**
_____

A Shelby County jury convicted the Defendant, Jarvis Gray, of rape of a child and aggravated sexual battery, and the trial court sentenced him to fifty-two years to be served in the Tennessee Department of Correction.  On appeal, the Defendant contends that the trial court erred when it: did not allow his expert witness to testify; limited his cross-examination of the victim; and admitted into evidence statements from a rape crisis report.  After a thorough review of the record and the applicable law, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT L. HOLLOWAY, JR.,   JJ., joined.

Robert Golder, Memphis, Tennessee, for the appellant, Jarvis Gray a/k/a Prophet Gray.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; E. Cavett Ostner and Dru Carpenter, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from the Defendant's rape of the victim, a nine-year-old girl whose family the Defendant had befriended at church and with whom he lived.  Based on this conduct, a Shelby County grand jury indicted the Defendant for rape of a child and aggravated sexual battery.

**A. Trial**

The following evidence was presented at the Defendant's trial: Elijah Marshall testified that he worked as a pastor at the Apostolic Prophetic Assembly and had three children, ages twelve, nine, and seven years. Mr. Marshall first met the Defendant at a church function, and they developed a close relationship. Eventually the Defendant became Mr. Marshall's "right-hand-man" and pastoral assistant. Mr. Marshall allowed the Defendant to move into his home in June or July of 2012. The Defendant was a "big brother" figure to Mr. Marshall's children and was alone with them for extended periods of time. In July of 2013, Mr. Marshall received a call from the director of his children's daycare, and she informed him that his daughter, E.M.,[1] said she had been "inappropriately touched." E.M. was approximately six years old at the time.

On cross-examination, Mr. Marshall stated that E.M. had not made any complaints to him regarding the Defendant. Mr. Marshall agreed that he had said in the past that E.M. "has a tendency to lie concerning behavioral problems in school." He agreed that she had lied in the past to avoid punishment and had caused a school official to almost lose his job.

M.W., twelve years old at the time of trial, testified that he was Mr. Marshall's son and had two younger sisters. M.W. recalled the Defendant's living with his family; Mr. Marshall and his wife slept in one room, the three children slept in another, and the Defendant slept in a third bedroom. The Defendant lived with their family for about a year, during which time he was sometimes alone with the three children. The Defendant was alone with one of M.W.'s sisters, E.M., on multiple occasions, sometimes in the Defendant's room with the door shut.

Outside the presence of the jury, the Defendant informed the trial court that he wished to question E.M. about an alleged prior false accusation of sexual abuse that she had made against a school employee. The Defendant alleged that reports from the Department of Children's Services, unrelated to this case, had been discovered by his team's investigator and the reports apparently referenced this prior accusation. The trial court noted that Mr. Marshall's testimony regarding the prior accusation did not reference that it was an accusation of sexual abuse, "just [an accusation] that involved somebody's job at school that almost caused somebody to get fired." The trial court asked about the Defendant's sources for this prior accusation, to which the Defendant replied, "From [E.M.'s] conversations with other family members, . . . they had personal knowledge of these accusations." The trial court stated that it would not allow the Defendant to cross-examine E.M. based on a hearsay statement in a report; the trial court stated that it found no good faith basis for the line of questioning on the basis that the source was "an

---

[1]It is the policy of this court to refer to minors by their initials.

investigator talking to some family members that may have had some knowledge of some things and said that those things might have happened. That's . . . rank hearsay." However, the trial court "out of an abundance of caution" allowed the Defendant to make an offer of proof on this evidentiary issue and permitted the Defendant to ask E.M. limited questions to allow for a complete record.

In a jury-out hearing, the trial court asked E.M. if she had ever known a person named Kole Barton. E.M. denied knowing anyone by that name. E.M. stated that she had not previously made an allegation about someone touching her inappropriately, other than her allegation about the Defendant.

The jury returned to the courtroom, and E.M. testified that she was in the fourth grade at the time of trial. She recounted that the Defendant lived with her family at some point, during which time she and her siblings were sometimes left alone in their house with him. She stated that "it" happened more than once, in the Defendant's bedroom, while her parents were out of the house. The door to the bedroom was closed, and the Defendant placed E.M. on his bed and got on top of her. Her pants and underwear were off and the Defendant's clothes were off. The Defendant's "middle part" touched E.M.'s "private part," and the Defendant was "going up and down" while they were touching. E.M. recalled that "[s]omething yellow" came out of the Defendant's private part and "got on" her.

E.M. testified that, one time when she was lying on the Defendant's bed in his bedroom, her brother knocked on the door. That time, the Defendant's private part was touching her private part but nothing came out of his private part. E.M.'s brother asked where E.M. was, and the Defendant told E.M. to be quiet. E.M. then told her teacher and daycare principal what had happened.

On cross-examination, E.M. denied feeling pain when the Defendant's "middle part" touched her private part because "it really didn't go inside me. It was on the outside." She stated that he "went" "more than once" "on the outside."

DeShannon Smith testified that she worked as a teacher at E.M.'s daycare and met her when E.M. was three years old. One day, when E.M. was five years old, Ms. Smith observed E.M. lying on her cot during naptime. E.M. was touching her vagina on the inside of her underwear in a repetitive movement; Ms. Smith believed E.M. was masturbating. Ms. Smith removed E.M. from the classroom and told her she was not in trouble and asked what E.M. had been doing. E.M. told Ms. Smith that she had been "touching herself" in her "private area" and when Ms. Smith asked her why, E.M. responded, "Because he showed me how to do it." E.M. clarified that "he" was the Defendant, who Ms. Smith knew as E.M.'s "godbrother" and who had introduced himself

to Ms. Smith personally. Ms. Smith asked E.M. again who was touching her, and she replied that it was her "godbrother," the Defendant, "Prophet Gray." Ms. Smith told E.M. that Ms. Smith would have to tell someone what had happened, and E.M. did not want her to do that because E.M. was scared of getting in trouble.

Ms. Smith recalled that the Defendant had introduced himself to her on a prior occasion as "the Marshalls' godbrother" and said his name was "Prophet Gray." Ms. Smith took E.M. to her supervisor, and they called the police.

On cross-examination, Ms. Smith testified that when she caught E.M. touching herself at school, E.M. "froze" and was "petrified."

Tiffany Wilson testified that she was the director at E.M.'s daycare when this incident occurred. In July of 2013, Ms. Smith brought to Ms. Wilson's attention that E.M. had been masturbating in class. Ms. Wilson questioned E.M. about this report and when she asked E.M. if anyone had ever "bothered" her "down there," E.M. replied "yes" and that her "boyfriend" "Prophet Gray" had put "it" in her. E.M. specifically stated that the Defendant had put his private part inside her private part. E.M. told Ms. Wilson that this happened when she was alone with the Defendant in the bedroom at her house. Ms. Wilson asked E.M. who the Defendant was, and she replied, "the man who puts us on the bus." Ms. Wilson immediately called the owner of the daycare and the police.

On cross-examination, Ms. Wilson stated that she asked E.M. open-ended questions so as not to coerce her into saying anything untrue. Ms. Wilson agreed that she had noticed in the past that E.M. was a bit "hypersexual" for a five-year-old child and that she brought that to Mr. Marshall's attention.

Kristine Gable testified that she worked as a sexual assault nurse examiner at the Rape Crisis Center. The trial court qualified her as an expert in the field of forensic nursing. E.M. came to the Rape Crisis Center on July 31, 2013 to be examined. Ms. Gable read from the report taken during E.M.'s examination; the Defendant objected to statements in the report being read aloud. Ms. Gable stated that the examination had been conducted by a nurse who had since moved out of state. Ms. Gable read the following statement from the report:

> Five-year-old female disclosed vaginal penetration at . . . forensic interview. Mother stated that she learned from daycare director that [the Defendant], a twenty-four-year old minister living in the home at the time, had touched [E.M.] inappropriately. [E.M.] told mother after the exam that he had touched her with his private part.

4

Ms. Gable testified that during the examination, a medical history was obtained from E.M. and her family, and a physical examination was performed on the area where E.M. reported to have been assaulted. E.M. was examined by a nurse at the center, and the examination revealed no injuries, which was not uncommon according to Ms. Gable.

Marlon Wright testified that he was a lieutenant with the Memphis Police Department and was assigned to the Sex Crimes Unit in 2013. He responded to the call to 911 from Ms. Wilson and arrived at E.M.'s daycare. While at the daycare, E.M.'s parents and the Defendant arrived, and officers took the Defendant into custody.

The Defendant made an offer of proof of the testimony of Dr. John McCoy, a clinical psychologist experienced in counseling children who been sexually abused. Dr. McCoy stated that he had testified in previous trials as to the suggestibility of child witnesses and the impact of leading questions on their testimony about sexual abuse. The trial court declared Dr. McCoy an expert in the field of child psychology. Dr. McCoy testified that he had heard E.M.'s testimony in this case and had reviewed the transcript of E.M.'s forensic interview. Dr. McCoy said that, based on his knowledge of the case, he could testify to factors that might have caused E.M. to "drift astray" in her testimony, but he could not testify as to whether she had actually been sexually assaulted. He testified that the forensic interviewer was suggestive in her questioning of E.M. and did not ask E.M. open-ended questions. Dr. McCoy testified that the forensic interviewer was not a "trained, educated, smart sex abuse counselor" based on her questioning of E.M. His opinion was that the interviewer was putting words in E.M.'s mouth.

Dr. McCoy testified that because E.M. had been asked to retell the story of what happened to her many times, she might have been influenced by other people suggesting something had happened to her when it in fact had not. Dr. McCoy agreed that in this case, there were multiple factors present that lead him to believe E.M.'s testimony had been influenced. At the conclusion of Dr. McCoy's testimony, the court concluded that his opinion testimony regarding the possibility that E.M.'s testimony or statements had been unduly influenced was irrelevant and inadmissible. The trial court stated that Dr. McCoy's proposed testimony would be an indirect comment on E.M.'s credibility, who Dr. McCoy had never spoken to personally. As such, his testimony would have been based on speculation, and thus the trial court concluded that he would not be allowed to testify.

Based upon the evidence presented at trial to the jury, the Defendant was convicted of rape of a child and aggravated sexual battery. The trial court imposed consecutive sentences of forty years for the rape of a child conviction and twelve years for the aggravated sexual battery conviction for a total effective sentence of fifty-two years. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant asserts that the trial court erred when it: (1) barred Dr. McCoy from testifying; (2) limited his ability to cross-examine E.M.; and (3) admitted into evidence statements from a rape crisis report. The State responds that the trial court properly excluded Dr. McCoy's testimony and properly limited the Defendant's cross-examination of E.M. The State further responds that the trial court properly admitted the statements from the rape crisis report pursuant to a hearsay exception.

### A. Dr. McCoy's Testimony

The Defendant asserts that the trial court erred when it excluded Dr. McCoy's testimony. He contends that the testimony was reliable and "constitutionally necessary" to present a defense to a case predicated solely on the testimony of E.M. The State responds that the truthfulness or reliability of E.M.'s testimony was a question for the jury alone and that Dr. McCoy's testimony offering his opinion on the possible influences on E.M.'s story would have "invaded the jury's role in assessing the credibility" of E.M.

The admissibility of expert testimony is governed by Rules 702 and 703 of the Tennessee Rules of Evidence. *See generally McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257 (Tenn. 1997). Rule 702 addresses the need for expert testimony and the qualifications of the expert: "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. Rule 703 focuses on the reliability of expert opinion testimony. Generally, the admissibility of expert testimony is a matter entrusted to the sound discretion of the trial court, and no reversal occurs on appeal absent clear abuse of that discretion. *See State v. Scott*, 275 S.W.3d 395, 404 (Tenn. 2010); *State v. Copeland*, 226 S.W.3d 287, 301 (Tenn. 2007). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *Scott*, 275 S.W.3d at 404 (citing *Konvalinka v. Chattanooga–Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008)).

In the case of a witness who seeks to testify as an expert in the area of child forensic interview techniques, this court has upheld the trial court's decision to exclude such an expert in a case where the trial court deemed the testimony would not substantially assist the jury or would lead to confusion within the jury. Recently, in *State v. William Rolandus Keel*, a panel of this court affirmed the trial court's decision to

6

exclude a doctor's testimony about the "impropriety of the interview techniques" utilized when interviewing the sexual assault victim. No. M2016-00354-CCA-R3-CD, 2017 WL 111312, at *3-6 (Tenn. Crim. App., at Nashville, Jan. 11, 2017), *perm. app. denied* (Tenn. April 13, 2017). We concluded that the doctor, who could not give an expert opinion on whether in fact the victim was telling the truth or not, would be commenting on the truthfulness of the victim's testimony and "could certainly [lead] to juror confusion." *Id.* at *6. We further concluded that the lack of scientific methodology behind the doctor's conclusions justified the trial court's decision that his expert opinion would not "substantially assist" the trier of fact. *Id.*

In this case, the Defendant made an offer of proof of Dr. McCoy's testimony that, based on the influential factors present in this case, it was possible that E.M.'s story that she had been raped by the Defendant was in some way untruthful. The trial court concluded that this was improper opinion testimony on E.M.'s credibility, which the trial court stated was the result of speculation on the part of Dr. McCoy, who had never questioned E.M. personally. Accordingly, the trial court ruled that Dr. McCoy's proposed testimony would be an improper opinion as to the veracity of E.M.'s testimony and declined to allow Dr. McCoy to testify. Based on our review, we conclude that the trial court did not abuse its discretion when it did not allow Dr. McCoy to testify. During the offer of proof, Dr. McCoy agreed that he could only offer his opinion based on the possibility that E.M.'s testimony had been influenced. This speculative opinion was not based on scientific or technical knowledge and would have encroached on the jury's task of weighing the veracity and credibility of E.M.'s testimony, the crux of this case. Thus, the trial court did not abuse its discretion when it excluded Dr. McCoy's testimony. Accordingly, the Defendant is not entitled to relief on this issue.

## B. Cross-Examination of the Victim

The Defendant contends that the trial court erred when it limited the cross-examination of E.M. about a prior false sexual abuse allegation she made against a school employee. He contends that the trial court impermissibly relied on Tennessee Rule of Evidence 412, which limits the introduction of evidence of a victim's prior sexual behavior. The Defendant contends that E.M.'s prior allegation was not subject to this rule and should have been admitted as evidence regarding her credibility. The State responds that the Defendant did not have a good faith basis for questioning E.M. about the prior false allegation because he had no evidence to substantiate the claim and because E.M. denied having made the prior allegation. The State further responds that the trial court limited the questioning based on Tennessee Rule of Evidence 608(b), not Rule 412 as the Defendant contends, after the trial court held the required jury-out hearing and determined that there was no factual basis. We agree with the State.

7

Under Rule 401, "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Rule 402 states, "All relevant evidence is admissible except as provided by the Constitution of the United States, the Constitution of Tennessee, these rules, or other rules or laws of general application in the courts of Tennessee. Evidence which is not relevant is not admissible." Tenn. R. Evid. 402. Finally, Rule 403 states, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. "The decision regarding the admissibility of [evidence] pursuant to these Rules lies within the sound discretion of the trial court and will not be overturned on appeal absent a clear showing of an abuse of that discretion." *State v. Young*, 196 S.W.3d 85, 105 (Tenn. 2006) (citing *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978)).

Tennessee Rule of Evidence 608(b) provides that specific instances of conduct may be used to impeach a witness during cross-examination if the conduct is probative of the witness's character for truthfulness or untruthfulness. Tenn. R. Evid. 608(b). If the witness denies the conduct, the party proffering the evidence must be satisfied with that response and may not seek to prove the conduct by extrinsic evidence. *See* Tenn. R. Evid. 608(b). Before a witness can be questioned about the specific instance of conduct, the court, upon request, must hold a jury-out hearing "to determine that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry." Tenn. R. Evid. 608(b)(1).

This court addressed the admissibility of evidence that a sex crime victim made a previous false allegation of sexual abuse in *State v. Wyrick*, 62 S.W.3d 751, 776-85 (Tenn. Crim. App. 2001). The panel discussed the conditions under which such evidence would be admissible under Rule 404(b), as substantive proof of some matter actually at issue on trial, and under Rule 608(b), as a specific instance of conduct used to impeach the witness on cross-examination. *Id.* at 780. The panel emphasized that, "in the absence of proof that [the witness] falsified the other allegation," the prior allegation is immaterial and, thus, inadmissible under either rule. *Id.*

In this case, the trial court held a jury-out hearing, during which E.M. testified that she had not made any prior accusations of sexual abuse. She denied knowing the person against whom she had allegedly reported the abuse. At the conclusion of the hearing, the trial court refused to allow the Defendant to cross-examine E.M. about the prior false allegation, citing that the Defendant had no evidence that one had been made. The trial

8

court stated that it would not allow a hearsay statement about a prior accusation to be the basis for this line of questioning.

Because the trial court complied with the procedural rules of Rule 608(b) by holding a hearing and determining that a reasonable factual basis did not exist to establish that E.M. had made a prior false allegation of sexual abuse, we will not overturn the trial court's decision to exclude the evidence absent an abuse of discretion. *See* Tenn. R. Evid. 404(b).

We conclude that the trial court did not abuse its discretion when it determined that the evidence was not admissible under Rule 608(b), which requires a party to establish a "factual basis" for the conduct in order to impeach a witness. Tenn. R. Evid. 608(b)(1). We conclude that the trial court did not abuse its discretion in refusing to allow the cross-examination of E.M. on this issue. The Defendant is not entitled to relief as to this issue.

### C. Rape Crisis Report

The Defendant lastly contends that the trial court erred when it admitted into evidence statements made by E.M. in the rape crisis report. He contends that these statements were testimonial hearsay not admissible pursuant to any of the hearsay exceptions. He also contends that the statements violated his right to confront the witness. The State responds that the statements in the report were admissible pursuant to the medical records exception to the hearsay exclusion rule found at Tennessee Rule of Evidence 803(4). The State further responds that the Defendant's confrontation right was not violated because he was afforded the opportunity to cross-examine the witness, E.M., at trial. We agree with the State.

Hearsay evidence consists of out-of-court statements offered for the truth of the matter they assert. Tenn. R. Evid. 801(c). There are concerns with reliability and the inability to cross-examine such statements, which is why they are excluded as admissible evidence. Tenn. R. Evid. 802. When the reliability of a statement can be verified, generally by the context of the statement, that statement may fall under a hearsay exception and then be admissible in court. One such exception is found at Tennessee Rule 803(4), which states:

> Statements made for [the] purposes of medical diagnosis and treatment describing medical history; pain or present symptoms, pain, or sensations; or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

The rationale behind this exception depends on the notion that people will be forthcoming to medical professionals to ensure proper and appropriate treatment and care. NEIL P. COHEN, ET AL., TENNESSEE LAW OF EVIDENCE, § 8.09[3][b] (5th ed. 2005).

In *State v. McLeod*, the Tennessee Supreme Court held that statements by a child pertaining to sexual abuse, about the general character, cause, or source, are admissible as testimony from the person to whom the child told it, so long as there is a jury-out hearing and an assurance that the child gave the statement for diagnosis and treatment. 937 S.W.2d 867, 870 (Tenn. 1996). When the trial court conducts a jury-out hearing to address the indicia of reliability of the child victim's statement, it should analyze "the timing of the statement, the contents of the statement, whether the statement was made in response to suggestive or leading questions, whether the statement was improperly influenced by another, and any other circumstance that may undermine the statement's trustworthiness such as a custody battle or family feud." *State v. Tucker*, No. M2005-00839-CCA-R3-CD, 2006 WL 547991, at *9 (Tenn. Crim. App., at Nashville, Mar. 7, 2006) (citing *McLeod*, 937 S.W.2d at 870, *State v. Stinnett*, 958 S.W.2d 329, 332 (Tenn. 1997)), *no Tenn. R. App. P. 11 application filed*.

The Sixth Amendment of the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. The Tennessee Constitution provides the corresponding right "to meet witnesses face to face." Tenn. Const. art. I, § 9.

We conclude that the trial court did not abuse its discretion when it admitted the statement under the medical diagnosis and treatment hearsay exception. Ms. Gable, a nurse practitioner, testified that the purpose of the interview with E.M. was to obtain her medical history and to conduct a physical examination of the area where E.M. stated that she had been sexually assaulted. As such, her statement that she had been "vaginally penetrated" was for the purposes of "medical diagnosis and treatment" and was then followed by a physical examination of the victim. The statement read into the record by Ms. Gable was simply the statement that directed the nurse examiner where to examine her physically. Although the trial court was remiss in not holding a jury-out hearing in regard to the circumstances surrounding the statement being made, Ms. Gable's testimony provided the trial court with sufficient information as to when and how E.M.'s statement was made, from which the trial court could make a determination that the statement was made for the purposes of medical diagnosis and treatment, and a determination about the statement's reliability. Accordingly, the trial court did not abuse its discretion when it admitted E.M.'s statement into evidence pursuant to Tenn. R. Evid. 803(4). The Defendant is not entitled to relief on this issue.

10

## III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE